## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

COLT ENERGY, INC., et al.,

      Plaintiffs,

      v.                                                  Case No. 5:20-cv-04059-HLT

SOUTHERN STAR CENTRAL GAS
PIPELINE, INC.,

      Defendant.

## MEMORANDUM AND ORDER

Plaintiffs Colt Energy, Inc. and Wild River Energy, LLC sued Defendant Southern Star Central Gas Pipeline, Inc. for several claims arising out of the alleged interference of Defendant's storage gas with Plaintiffs' oil wells. Defendant moves for summary judgment on all claims. Doc. 68. Also at issue are three motions challenging expert testimony—one by Plaintiffs and two by Defendant. Docs. 63, 66, 67. Because Plaintiffs have not established any question of fact about the presence of storage gas on the Koch Lease and have no evidence of temporary damages for the Rook Lease (to the extent they have shown the presence of storage gas on that lease), the Court grants Defendant summary judgment on all Plaintiffs' claims and denies as moot the other motions.

## I.    BACKGROUND[1]

Plaintiffs are the lessees, and Plaintiff Colt Energy is the operator, of two oil leases at issue. Doc. 68 at ¶ 5. The first is the Rook Lease, and the second is the Koch Lease. *Id.* The Rook Lease is within the boundary of the South Welda Field. *Id.* ¶ 6. The Koch Lease is on property adjoining the South Welda Field. *Id.*

---

[1]    For purposes of summary judgment, the Court considers the following uncontroverted facts.

Defendant is the lessee of a storage-gas lease for the South Welda Field. *See id.* ¶ 7. Defendant purchases natural gas sourced elsewhere and injects it into the sub-surface storage area in the South Welda Field. *Id.* ¶ 1. The South Welda Field has been used for natural gas storage since 1937. *Id.* ¶ 2. Storage in the South Welda Field was initially vertically limited to the Colony Sand Formation. *Id.* ¶ 3. But over the years, storage gas has moved upward into the area known as the Squirrel Sand Formation. *See* Doc. 79 at 7.[2] Gas held in the storage area can migrate if there is both a pathway and higher pressure in the storage area. *Id.* at 6.

In 2008, Defendant attempted to expand the lateral boundary of the South Welda Field, which would have included the land containing the Koch Lease. Doc. 68 at ¶¶ 24-25. In doing so, it submitted a report to the Federal Energy Regulatory Commission ("FERC") that stated that lateral movement of storage gas was "somewhat limited," and that "[s]torage gas that has moved upward into the Squirrel Sandstones typically does not appear to travel over any great distance." *Id.* Further, storage gas was reported in only a sliver of the Koch Lease. *Id.* ¶ 26. FERC inquired further and determined that only minor gas vapors were present west of the South Welda Field. *Id.* ¶ 29. No compositional analysis was completed to confirm that storage gas was present. *Id.* ¶ 30. FERC subsequently denied Defendant's request for lateral expansion because it appeared storage gas was unlikely to laterally migrate. *Id.* ¶¶ 4, 31. However, Defendant's certification was amended to include geologic formations 700 feet to 1,050 feet beneath the surface. *Id.* ¶ 3. This includes the Squirrel Sand Formation. *Id.* At the time of the 2008 filing, Defendant also sought to obtain certain oil leases within the boundary of the South Welda Field. *Id.* ¶ 38. As part of that

---

[2]   Citation to the uncontroverted facts in Defendant's motion (Doc. 68) is by paragraph number. Citation to uncontroverted additional facts included in Plaintiffs' response (Doc. 79) is by page number.

process, M.A.E. Resources, who owned the Rook Lease at the time, did not report any gas pressure on any of the wells at issue. *Id.* ¶ 39.

Plaintiffs acquired their interests in the Rook and Koch Leases when they purchased a package of 17 oil and gas leases from M.A.E. Resources in 2017. *Id.* ¶ 8. The leases were purchased as a package for $3.1 million. *Id.* ¶ 9. But the value of the Rook and Koch Leases were allocated a value of $0 because there had been no production on either lease in the months or years before the purchase. *Id.* However, the primary owners of M.A.E. Resources had passed away and the new owners lacked experience. Doc. 79 at 10. Plaintiffs believed they could resolve the operational issues for the leases and produce more than what the prior owners had. *Id.* at 10-11. At the time of the purchase, Plaintiffs were aware that there was storage gas in the Squirrel Sand Formation and were told to take necessary steps to confirm that the storage gas would not constrain their planned operations. Doc. 68 at ¶ 10. The previous producers had experienced high-pressured storage gas on the Rook Lease. Doc. 79 at 12.

Oil production on the Rook and Koch Leases ended in 2016 and 2013, respectively. Doc. 68 at ¶¶ 14-15. Plaintiffs contend that storage gas began negatively impacting oil production in 2006. *Id.* ¶ 16. In November 2017, there was a blowout on a well on the Rook Lease. Doc. 79 at 13. During a blowout, a high flow of high-pressure gas is expelled. *Id.* In March 2019, testing on the Rook Lease found abnormally high pressures. *Id.* at 11. In 2018, Plaintiffs drilled on the Koch Lease, but it was dry, and no gas was found. Doc. 68 at ¶ 17. A dry well drilled in 2019 near the border of the Rook Lease and the Koch Lease discovered no pressure from storage gas. *Id.* ¶ 33.

Plaintiffs and Defendant are successors to an agreement from 1936 between W.S. Fees and Cities Service Gas Company ("Fees Agreement"). *Id.* ¶ 18. The Fees Agreement requires that the parties "conduct . . . operations so that there shall be no unreasonable interference with the

operation of the other party." *Id.* ¶ 19; *see also* Doc. 68-9 at 7. The properties covered by the Fees

Agreement are listed in Exhibit A to the agreement. Doc. 68 at ¶ 20. But none of the leases listed

in Exhibit A to the Fees Agreement are located on the section of property containing the Rook or

Koch Leases, Section 21. *Id.* ¶ 21. Exhibit A further states: "It is intended that this exhibit shall

cover and include all of and only the properties of W.S. Fees embraced in plat attached hereto and

marked Exhibit 'C', notwithstanding that any of same may not be herein specifically or accurately

described." *Id.*; *see also* Doc. 68-9 at 13. Exhibit C to the Fees Agreement is a map that shows

only a portion of Section 21 and includes only part of the Rook and Koch Leases. Doc. 68 at ¶ 22.

W.S. Fees's name is not listed on the portion of the map showing Section 21. *Id.* ¶ 23; Doc. 68-9

at 17.

Plaintiffs contend that Defendant's storage gas in the Squirrel Sand Formation interferes

with Plaintiffs' oil production on the Rook and Koch Leases. Doc. 68 at ¶ 41. Plaintiffs believe

they cannot produce on either the Rook or Koch Leases because of the impediment of high-

pressure gas. Doc. 79 at 13. Plaintiffs contend that the developed and undeveloped oil reserves on

the Rook and Koch Leases are valued at $7,728,000. Doc. 68 at ¶ 42. Plaintiffs contend the

damages they seek are attributable to lost oil production due to the presence of uncontrolled natural

gas that has migrated from the storage area. Doc. 79 at 9.

Plaintiffs have not performed any testing to determine if there is storage gas on the Rook

or Koch Leases. Doc. 68 at ¶¶ 32, 37. Plaintiffs have not designated an expert to testify about the

presence of storage gas on the Koch Lease. *Id*. ¶ 36.[3] Nor have Plaintiffs designated an expert on

whether there is any reasonable or practical action Defendant could take to mitigate storage gas in

---

[3]   Defendant also contends that no expert has been designated to testify about the existence of storage gas on the
Rook Lease, but Plaintiffs controvert that fact based on testimony of non-designated experts.

the Squirrel Sand Formation that would allow Plaintiffs to produce oil on either the Rook or Koch Leases. *Id.* ¶ 45.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

## III.    ANALYSIS[4]

The underlying premise of Plaintiffs' claims is that natural gas injected by Defendant "into the formations of the South Welda field and or related adjacent storage fields has migrated from the authorized storage formations into Plaintiffs' oil wells located on the Rook and Koch leases." Doc. 61 at 4. Plaintiffs contend that the presence of the high-pressure storage gas in the well bores interferes with and prevents them from producing oil. *Id.* at 4-5.

---

[4]    Plaintiffs move for leave to file a surreply. Doc. 84. Surreplies are not permitted without leave of court. *See Patterson v. Lansing*, 2001 WL 946181, at *2 (D. Kan. 2001). The request stems from arguments made in Defendant's reply that Plaintiffs have cited evidence that they did not disclose during discovery. Plaintiffs' proposed surreply indicates that the evidence was disclosed. Doc. 84-1 at 2. In response, Defendant concedes as much. Doc. 85 at 1. Although the issues regarding the surreply are generally not material to this order, for purposes of clarity of the record, the Court grants Plaintiffs' motion to file a surreply and deems the proposed surreply (Doc. 84-1) filed.

Plaintiffs assert four claims based on this conduct. First, they assert intentional and continuing nuisance under Kansas law based on the presence of high-pressure storage gas on their leases. *Id.* at 7.

Second, Plaintiffs assert breach of the Fees Agreement. *Id.* Plaintiffs contend that the Fees Agreement requires Defendant to "conduct its operations so that there shall be no unreasonable interference with the operation of the other party." *Id.* None of the parties seems to dispute that the Fees Agreement applies to the parties. But they disagree whether the Fees Agreement applies to either the Rook or Koch Leases.

Third, Plaintiffs claim Defendant breached its duty under K.S.A. § 55-1203, which allows for the underground storage of natural gas so long as it is "without prejudice to the rights of the owner of said lands or other rights or interests therein as to all other uses thereof." Plaintiffs contend Defendant breached its duty under the statute and "[t]his breach, the resultant presence of high-pressure storage gas is the cause of physical and economic damages suffered by Plaintiffs . . . ." *Id.* at 8.

Fourth, Plaintiffs allege Defendant has breached an implied covenant of diligent and prudent operation of its storage-gas lease and the implied covenant of good faith and fair dealing,[5] which has damaged Plaintiffs by interfering with Plaintiffs' oil production. *Id.*

Because all these claims require a showing that storage gas is present and interfering with the Rook and Koch Leases and causing the damages that Plaintiffs assert, the Court first considers whether there is a genuine issue of fact on those issues. The Court then considers alternative

---

[5]   It's unclear whether Plaintiffs are alleging these implied covenants in relation to the Fees Agreement or some other contractual arrangement, or whether they have some other legal genesis. *See* Doc. 79 at 36-37 (discussing covenant of good faith and fair dealing as a duty owed between contracting parties).

arguments challenging Plaintiffs' nuisance claim, breach-of-contract claim, and implied-covenant claim.

### A.      Arguments Applicable to All Claims

#### 1.      Evidence of Storage Gas on Rook and Koch Leases

Defendant argues that Plaintiffs have no evidence showing the presence of storage gas on the Rook and Koch Leases, which is a necessary premise for all their claims. Doc. 68 at 19-20. It is undisputed that Plaintiffs have not performed any testing to determine if there is storage gas on the Rook or Koch Leases or designated an expert to testify about the presence of storage gas on the Koch Lease, though Plaintiffs argue there are non-expert witnesses who can testify about storage gas on the Rook Lease. Plaintiffs nevertheless argue that the there is "ample evidence" on this point.

Plaintiffs point to their additional facts 1-16 as detailing "the history of storage gas migrating into the Squirrel Field." Doc. 79 at 24. But historical migration into the Squirrel Sand Formation does not establish that there is <u>currently</u> storage gas on the Rook and Koch Leases interfering with production, as Plaintiffs acknowledge elsewhere in their brief. *Id.* at 14 ("Migration of gas into the Squirrel formation is not the same as interference."); *see also id.* at 32 (arguing that there was no breach of contract just because gas migrated into the Squirrel Sand Formation).[6] Nor does this evidence speak to the presence of storage gas specifically on the Rook and Koch Leases.

---

[6]   Indeed, migration of storage gas in this area is not a new issue. *See Reese Expl., Inc. v. Williams Nat. Gas Co.*, 983 F.2d 1514, 1523 (10th Cir. 1993) ("Furthermore, the Colony-Welda field is riddled with old wells and the likelihood that pressurized gas might migrate between the Bartlesville and Squirrel formations is a recognizable risk. Even a minimal inquiry by Reese would have shown high levels of storage gas in the Squirrel formation."); *Kent v. S. Star Cent. Gas Pipeline, Inc.*, 2009 WL 10689384, at *1 n.3 (D. Kan. 2009) ("Migration in the Colony-Welda field is not a new phenomenon.").

Plaintiffs also cite testimony of one of Defendant's employees, who testified that the leases state that any gas from 1050 below the surface to the surface is storage gas belonging to Defendant. Doc. 79 at 24-25. Even if this is true,[7] this testimony does not establish that there is, in fact, storage gas on the Rook or Koch Leases, just that Defendant has a claim to it if there is.

Plaintiffs also refer to the "extensive compendium of testimony and other admissible evidence . . . listed above." Doc. 79 at 23. It is unclear which facts, other than those specifically cited, Plaintiffs rely on. This does not satisfy Plaintiffs' burden to come forward with evidence that proves a triable issue of fact on whether storage gas is present on the leases.

The only specific evidence of storage gas on either the Rook or Koch Leases is that there was a blowout on the Rook Lease in 2017 because of high-pressure gas. It is also undisputed that Plaintiffs tested pressure on the Rook Lease in 2019 and recorded abnormally high pressures of 350 pounds per square inch, which indicates the presence of storage gas. This evidence, though minimal, is sufficient to show the presence of storage gas on the Rook Lease.

However, Plaintiffs point to no similar evidence for the Koch Lease. At most, Plaintiffs point to a blowout on a well that occurred in 2021. Although they claim this well was "on the border between Rook and Koch," the evidence cited does not support that. Doc. 79 at 13.[8] It is also undisputed that drilling on the Koch Lease in 2018 and on the border between the leases in 2019 revealed no high-pressure gas. Doc. 68 at ¶¶ 17, 33-34.

---

[7] The witness specifically testified that there was no evidence of gas being from 1050 to the surface on the Koch Lease. Doc. 79-10 at 2. Defendant also disputes that the leases actually address ownership of storage gas, and a review of the leases does not show any such language. *See* Doc. 83-1 (Rook Lease); Doc. 83-2 (Koch Lease). Defendant also notes that the leases being discussed in the deposition are not the Rook and Koch oil leases, but the Rook and Koch gas leases, which are separate. *See* Doc. 83 at 14 n.3. But neither party has put forth evidence on this issue, or additional pages of the deposition transcript that would clarify this.

[8] The page of the deposition cited to was not included in the exhibit. *See* Doc. 79-3; Doc. 79 at 13 (citing Bleakley Dep., p. 66, lines 8-11). Plaintiffs also cite Exhibit 13, but that does not state that the well that blew in 2021 was on the border between the Rook and Koch Leases. Exhibit 13 actually refers to "Gas issue on the Rook lease." Doc. 79-14 at 8.

Based on the evidence, the Court concludes that Plaintiffs have identified evidence that creates a genuine issue of fact as to the presence of storage gas on the Rook Lease. But they have not made such a showing as to the Koch Lease. Accordingly, Defendant is entitled to summary judgment as to all claims based on the Koch Lease.

## 2.    Evidence of Temporary Damages

Defendant alternatively argues that Plaintiffs have no evidence of temporary damages to sustain any of their claims, nor have they presented evidence that injunctive relief would be warranted.[9] Doc. 68 at 25-26. Specifically, Defendant argues that Plaintiffs' only damages expert "has purported to calculate the amount of oil reserves and has computed Plaintiffs' damages as a total loss of the ability to produce oil from those reserves." *Id.* at 25. Defendant also argues Plaintiffs have no evidence that the intrusion they complain of—the presence of storage gas on the oil leases—is abatable, which is contrary to a claim for both temporary damages and injunctive relief. *Id.* at 25-26.

Plaintiffs clarify in their response that they are asserting a claim for temporary damages, specifically for "damages which accrued as a result of the temporary nuisance within the two years prior to the filing of the lawsuit." Doc. 79 at 27.[10] "Temporary damages or continuing damages limit recovery for injury that is intermittent and occasional and the cause of the damages

---

[9]    Defendant also argues that any claim for permanent damages is barred by the statute of limitations. Doc. 68 at 20-25; *see also Kent*, 2009 WL 10689384, at *6 ("A claim for permanent damages, i.e. past, present, and prospective damages, is barred in its entirety once the statute of limitations has run. A claim for temporary damages accrues each time a new injury occurs."); *Miller v. Cudahy Co.*, 858 F.2d 1449, 1454 (10th Cir. 1988) ("If permanent damages are sought, an action claiming such damages must be brought within two years."). In response, Plaintiffs clarify that they are not making a claim for permanent damages. *See* Doc. 79 at 30 (stating that "the damages sought are temporary and continuing"). "If the injury or wrong is classified as temporary, the limitation period starts to run only when the plaintiff's land or crops are actually harmed, and for purposes of the statute of limitations, each injury causes a new cause of action to accrue, at least until the injury becomes permanent." *Miller*, 858 F.2d at 1454. Accordingly, Plaintiffs' clarification resolves the statute-of-limitations argument.

[10]    Both parties cite the standard used in Kansas to determine whether damages are temporary or permanent. *See Isnard v. City of Coffeyville*, 917 P.2d 882, 888 (Kan. 1996). But it's unclear why this analysis would be needed given Plaintiffs' statement that they seek temporary damages, not permanent damages.

remediable, removable, or abatable." *Isnard*, 917 P.2d at 887 (quoting 25 C.J.S., Damages § 2, p. 626).

However, Plaintiffs have no evidence of <u>temporary</u> damages, particularly those accruing in the two years before the filing of the lawsuit as the result of an abatable condition. Defendant argues that the only damages expert Plaintiffs have is Lanny Butner, whose report values the <u>entirety</u> of the oil reserves on the Rook and Koch Leases. *See* Doc. 79-18 at 1 ("The total value of plaintiff's reserves that cannot be currently produced is: $7,728,00 . . . .").[11] Butner's report specifically values Plaintiffs' interest in both the developed and undeveloped reserves of both the Rook and Koch Leases. This is not an assessment of temporary damages—it is an assessment of the total and permanent value of the untapped oil reserves on the Rook and Koch Leases. The Pretrial Order acknowledges as much, as it seeks $7,728,000 in damages representing "the economic loss, past present and future, resulting from the continuing nuisance created by the presence of high-pressure storage gas." Doc. 61 at 10. In other words, Plaintiffs ostensibly seek only temporary damages, but they have no evidence or measure of what those damages are. And the only number they do provide is for permanent damages—the entire value of the oil leases, past, present, and future.

Nor have Plaintiffs created a genuine issue of material fact regarding whether the condition causing their damages is abatable, which they claim it is. For a claim of temporary damages, "[d]amages are awarded on the theory that the cause of the injury may and will be terminated." *Isnard*, 917 P.2d at 887; *see also* Doc 79 at 29 ("If an injury is abatable, as it is in this case, it constitutes temporary damages."). But the only facts Plaintiffs point to on this issue is testimony

---

[11]   Defendant challenges Butner's expert opinion as unreliable. Doc. 67. But even if the Court were to accept Butner's testimony, it does not provide evidence of <u>temporary</u> damages, for the reasons explained above

that gas could be recycled with boosters or lateral equipment. Doc. 79 at 30. But the pages of the exhibit cited were not included in the record. Additionally, Plaintiffs allege that a gas compressor was installed in the South Welda Field in 1981, which permitted gas in the Squirrel Sand Formation to be recompressed back into the storage field, which eliminated venting of gas. *Id.* at 9. But this testimony about a booster installed in 1981 was not specific to the Rook or Koch Leases and thus does not create a genuine issue of fact as to whether the presence of storage gas on those leases—to the extent there is any—is currently abatable.

In sum, Plaintiffs have characterized their damages as temporary and the offending condition as abatable, presumably to absolve themselves of any statute-of-limitations issues. But the only damages they assert are entirely permanent in nature—the entire value of the oil reserves. At the same time, they seek injunctive relief that would require Defendant to abate the condition causing the nuisance. Doc. 61 at 10. But Plaintiffs have not pointed to any evidence that this is possible. Further, to the extent Plaintiffs were successful in their claims, they would effectively receive a double recovery in that Defendant would be on the hook for the value of the oil reserves and the cost of abatement, leaving Plaintiffs ostensibly able to then produce the oil that Defendant has already paid for. *See* Doc. 79 at 30 ("The gas could be controlled by Southern Star and, consequently, Colt could produce the oil on its leases, accordingly, the damages sought are temporary and continuing.").

Based on this, the Court finds that, to the extent Plaintiffs have evidence of storage gas on the Rook Lease, they have no evidence of temporary damages or that the presence of storage gas is abatable. Defendant is therefore entitled to summary judgment on Plaintiffs' claims.

### B.    Alternative Arguments on Discrete Claims

Defendant makes alternative arguments for summary judgment on three of the four claims: intentional nuisance, breach of contract, and breach of implied covenants. The Court considers these alternative arguments.

### 1.    Intentional Nuisance

Defendant alternatively seeks summary judgment on Plaintiffs' intentional nuisance claim because Plaintiffs lack evidence of intent. Doc. 68 at 26-28. "Intentional private nuisance is a tort relating to the intentional and unlawful interference with a person's use or enjoyment of his or her land." *Byers v. Snyder*, 237 P.3d 1258, 1268 (Kan. Ct. App. 2010). It has four elements:

> (1) [T]he defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) there was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended; (3) the interference that resulted and the physical harm, if any, from that interference proved to be substantial; and (4) the interference was of such a nature, duration, or amount as to constitute unreasonable interference with the use and enjoyment of the land.

*N. Nat. Gas Co. v. L.D. Drilling, Inc.*, 697 F.3d 1259, 1267 (10th Cir. 2012) (citation omitted). The intent element does not require a showing of malice or bad intent. *Id.* at 1269. Rather, it requires that the actor "act with the purpose of causing the nuisance, or know that it is resulting or substantially certain to result from his or her conduct." *United Proteins, Inc. v. Farmland Indus., Inc.*, 915 P.2d 80, 85 (Kan. 1996). "To create an 'intentional' nuisance, it is not enough to intend to create a condition causing harm; the defendant must either specifically intend to damage the plaintiff or act in such a way as to make it 'substantially certain' that damage will follow." *Id.* (citation omitted). "Substantial certainty" requires something more than foreseeability or strong

12

probability; it is the equivalent of "inevitable, virtually sure and incapable of failing." *N. Nat. Gas Co. v. L.D. Drilling, Inc.*, 405 F. Supp. 3d 981, 1011 (D. Kan. 2019) (citation omitted).

Plaintiffs argue that they only must show that Defendant intended to permit storage gas to migrate to Plaintiffs' leases or that they knew migration was substantially certain to occur. Doc. 79 at 33-34. But this is contrary to the authority cited above. It is not sufficient that Defendant intended to create the condition causing harm—that is, the presence of migrating storage gas. *See United Proteins, Inc.*, 915 P.2d at 85. It must have intended to damage Plaintiffs. *See id.* Thus, to the extent Plaintiffs claim that Defendant increased pressure in the storage gas field, *see* Doc. 79 at 6-7,[12] that would not be evidence of intent sufficient to sustain an intentional nuisance claim.[13] Likewise, Defendant's knowledge that high-pressure gas caused a well to blow in 2017 does not create a genuine issue of fact on the question of whether Defendant intended to damage Plaintiffs, nor is it evidence that harm to Plaintiffs was substantially certain to continue occurring. *See United Proteins, Inc.*, 915 P.2d at 85-86 ("In this case, the pollution which migrated into the water table under UPI's property was the result of a release of chromium from Farmland's plant. There is no showing Farmland intended this leak into the aquifer and eventually under UPI's land.").

In the absence of evidence of intent, Defendant is alternatively entitled to summary judgment on Plaintiffs' intentional-nuisance claim.

---

[12] The factual allegations about increasing pressure are only that "[t]he storage field operator" increased pressures in 1978 or 1979. Doc. 79 at 6-7. But it's not apparent and far from clear that Defendant was in that role at that time.

[13] Plaintiffs also direct the Court to arguments regarding causation. Doc. 79 at 34 (referring to Section C of response brief). But although causation is a necessary element of a nuisance claim, it is distinct from the question of intent. In other words, regardless of whether Plaintiffs can show that there is recoverable oil in the wells that they cannot produce because of the presence of storage gas, that does not show that Defendant intended to prevent them from doing so. The Kansas Supreme Court has specifically cautioned against similar attempts to bypass the intent element of intentional nuisance. *United Proteins, Inc.*, 915 P.2d at 86 ("Having failed in its initial strict liability claim because of the statute of repose, UPI will not be permitted to create new causes of action for absolute continuing liability through traditionally intentional torts by eviscerating the element of intent.").

2.      **Breach of Contract**

Defendant alternatively argues that it is entitled to summary judgment on Plaintiffs' breach-of-contract claim. The existence of the Fees Agreement, which is dated Mach 18, 1936, is undisputed. It is also undisputed that Plaintiffs and Defendant are both successors under the Fees Agreement. And it is undisputed that the Fees Agreement requires the parties to that agreement to "conduct its operations so that there shall be no unreasonable interference with the operation of the other party." But Defendant argues it is entitled to summary judgment because Plaintiffs do not have any evidence that the Fees Agreement applies to the Rook or Koch Leases. Doc. 68 at 28-29.

In response, Plaintiffs point to an "acquisition opinion" given to Defendant that lists W.S. Fees and Helen Fees as a lessor on the Rook Lease as of May 8, 1937. Doc. 79 at 34-35; Doc. 68-4 at 2. But Plaintiffs never explains the significance of this. At most it shows that W.S. Fees was a lessor on the Rook Lease in 1937. But the Fees Agreement was executed in 1936. Plaintiffs also point out that Defendant is a successor under the Fees Agreement, and Plaintiffs are the lessees or operators of the both the Rook and Koch Leases. Doc. 79 at 35. But again, this doesn't really get at the issue, which is whether the Fees Agreement applies to the Rook and Koch Leases.

The only other argument Plaintiffs make is that Exhibit C to the Fees Agreement includes part of the Rook and Koch Leases, and that the Fees Agreement states that it covers any plat attached and marked on Exhibit C. *Id.* As explained above, Exhibit A to the Fees Agreement lists the leases covered by the Fees Agreement. *See* Doc. 68-9 at 12-13. None of the listed leases in Exhibit A are located on Section 21, which is where both the Rook and Koch Leases are located. *See id.*; *see also* Doc. 68 at ¶ 5. But Exhibit A further states: "It is intended that this exhibit shall cover and include all of and only the properties of W.S. Fees embraced in plat attached hereto and

marked Exhibit 'C', notwithstanding that any of same may not be herein specifically or accurately described." Doc. 68-9 at 13. Exhibit C to the Fees Agreement is a map that shows only a portion of Section 21, which includes part, but not all, of the Rook and Koch Leases. Doc. 68 at ¶ 22. And the portion of the map showing Section 21 does not include W.S. Fees's name. *Id.* ¶ 23; *see also* Doc. 68-9 at 17.

Plaintiffs' argument about Exhibit C does not establish a question of fact as to whether the Fees Agreement covers the Rook and Koch Leases. Plaintiffs argue that the "Fees Agreement states that it covers that [sic] any plat attached and marked Exhibit 'C'. There is no other name indicating ownership of the relevant portions." Doc. 79 at 35. But what the Fees Agreement actually says is that the agreement is intended to "cover and include <u>all and only the properties of W.S. Fees</u> embraced in plat attached hereto and marked Exhibit 'C'". Doc. 68-9 at 13 (emphasis added). But Exhibit C does not identify any properties of W.S. Fees in Section 21, which is where the Rook and Koch Leases are located. The only name listed in Section 21 on Exhibit C is D.W. Roy. *Id.* at 17. Further, it is undisputed that the map in Exhibit C only includes part, but not all, of the Rook and Koch Leases. Doc. 68 at ¶ 22.

In sum, Plaintiffs have failed to come forward with evidence showing that the Fees Agreement governs the parties' relationship as to the Rook and Koch Leases. Defendant is therefore alternatively entitled to summary judgment on Plaintiffs' claim for breach of the Fees Agreement.

### 3.    Breach of Implied Covenants

With regard to Plaintiffs' fourth claim—that Defendant has breached the implied covenant of diligent and prudent operation and the implied covenant of good faith and fair dealing—Defendant argues that (1) Kansas law has never applied the implied covenant of diligent and

prudent operation to storage-gas leases, (2) Plaintiffs have no expert testimony regarding the standards of conduct applicable to storage-gas operators, and (3) Plaintiffs have no evidence that Defendant has operated its lease arbitrarily or unreasonably in violation of the covenant of good faith and fair dealing. *Id.* at 29-31.

The implied covenant to operate a leasehold efficiently, which is also referred to as a covenant of diligent and prudent operation, is an obligation "to produce and market oil or gas after discovery." *Rook v. James E. Russell Petroleum, Inc.*, 679 P.2d 158, 166 (Kan. 1984); *see also Shaw v. Henry*, 531 P.2d 128, 131 (Kan. 1975). It is an implied covenant that arises out of the lessor-lessee relationship. *Rook*, 679 P.2d at 166. An implied covenant of good faith and fair dealing likewise applies to most contracts in Kansas. *See Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 266 (Kan. 2013).

Plaintiffs contend that, as lessees to a storage-gas lease in formations underlying Plaintiffs' leases, Defendant is bound by these covenants. The Court notes that the parties have dedicated little energy to explaining the basis for this claim, and there seem to be several legal questions about how or why these covenants would even apply in this case. Notably, neither party addresses whether or how Defendant owes any duties under these covenants <u>to Plaintiffs</u>. Nor do Plaintiffs explain how an obligation to produce and market oil or gas after discovery, *Rook*, 679 P.2d at 166, is implicated by Plaintiffs' claim that storage-gas has invaded its oil leases.

Further, Plaintiffs fail to address Defendant's argument that the implied covenant of diligent and prudent operation has never been applied to storage-gas leases. *See Reese Expl., Inc.*, 983 F.2d at 1522-23 (noting that although the "implied covenant could be interpreted to require an underground gas storage operator to act reasonably. . . the 'prudent-operator standard' has not been expressly applied to gas storage leases by Kansas courts").

The Court also agrees that Plaintiffs have identified no facts that establish the standards to which they seek to hold Defendant accountable. Plaintiffs have largely abdicated their obligation to come forward with facts that present a triable issue about this claim. As noted above, Defendant argues that Plaintiffs have no expert testimony regarding the standards of conduct applicable to storage-gas operators in violation of the covenant of diligent and prudent operation, and that Plaintiffs have no evidence that Defendant has operated its lease arbitrarily or unreasonably in violation of a covenant of good faith and fair dealing. Doc. 68 at 29-31. In response, Plaintiffs only contend that an expert cannot testify as to what a reasonable operator would do, which is not persuasive or correct,[14] and that whether good faith and fair dealing is met is a question of fact. But Plaintiffs must still point to the facts that create the question. Here, Plaintiffs only refer to the "specific facts above"—presumably referring to all the facts of the case—in support the claim that Defendant breached some duty. Doc. 79 at 37. This fails to meet their burden at this stage of summary judgment. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).

Because Plaintiffs have not come forward with any genuine issue of fact on whether Defendant's conduct violates these implied covenants, Defendant is alternatively entitled to summary judgment on Plaintiffs' implied-covenant claim.[15]

---

[14] The Court agrees with Defendant that Plaintiffs have misinterpreted the caselaw relied on for this argument. In *Northern Natural Gas Co. v. L.D. Drilling, Inc.*, the court was discussing expert opinions as to what a reasonable operator would do in the context of whether that testimony can show corporate knowledge and intent sufficient to establish intentional nuisance. 405 F. Supp. 3d at 1010-14. The decision did not conclude that expert testimony would never be permissible on the issue of whether a party violated an implied covenant of diligent or prudent operation. *See id.* at 1013 ("Of course, the plaintiff's experts can testify as to the general practices in the gas production industry, and conduct by defendants which may be unusual, anomalous, or contrary to standard industry practice, from which the jury could then infer knowledge.").

[15] To the extent Plaintiffs' claim for breach of implied covenants is based on the Fees Agreement, the fact that Plaintiffs have not established the applicability of the Fees Agreement would also necessarily entitle Defendant to summary judgment on this claim as well. *See supra* Section III.B.2. Plaintiffs have not otherwise identified any other contract between the parties that this claim might be based on.

D.      **Motions Challenging Expert Testimony**

Defendant has filed two *Daubert* motions challenging Plaintiffs' designated experts, and Plaintiffs have a filed a *Daubert* motion challenging Defendant's designated expert. Docs. 63, 66, and 67. Because the Court concludes that Defendant is entitled to summary judgment on each of Plaintiffs' claims for reasons unrelated to the issues raised in the *Daubert* motions, it does not reach those motions.

IV.    **CONCLUSION**

In summary, Plaintiffs have not established any question of fact regarding the presence of storage gas on the Koch Lease, and to the extent they have made such a showing for the Rook Lease, they have no evidence of the temporary damages they seek. This requires summary judgment for Defendant on all claims.[16] Plaintiffs' intentional nuisance claim alternatively fails for lack of evidence of intent. Plaintiffs' breach-of-contract claim alternatively fails for lack of evidence that the Fees Agreement applies to the Rook and Koch Leases. And Plaintiffs' implied-covenants claim alternatively fails for lack of evidence of the requisite duty of Defendant. In light of these rulings, the issues raised in the parties' *Daubert* motions are moot.

THE COURT THEREFORE ORDERS that Defendant's Motion for Summary Judgment and Memorandum in Support (Doc. 68) is GRANTED. Summary judgment is entered in favor of Defendant on each of Plaintiffs' claims for the reasons stated in this order.

THE COURT FURTHER ORDERS that Plaintiffs' Motion Seeking Leave to File Sur-Reply Brief (Doc. 84) is GRANTED. The proposed surreply (Doc. 84-1) is deemed filed.

---

[16] Accordingly, the Court does not reach Defendant's argument about Plaintiffs' claim for attorneys' fees under K.S.A. § 55-1210.

THE COURT FURTHER ORDERS that Plaintiffs' Motion In Limine to Exclude and/or Limit Testimony of Defendant's Expert William Johnson (Doc. 63) is DENIED AS MOOT and WITHOUT PREJUDICE.

THE COURT FURTHER ORDERS that Defendant's Motion to Strike and Exclude Testimony of Plaintiffs' "Rebuttal Expert" Dwayne McCune (Doc. 66) is DENIED AS MOOT and WITHOUT PREJUDICE.

THE COURT FURTHER ORDERS that Defendant's Motion to Exclude Testimony of Lanny Butner (Doc. 67) is DENIED AS MOOT and WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: April 29, 2022                    /s/ *Holly L. Teeter*
                                         HOLLY L. TEETER
                                         UNITED STATES DISTRICT JUDGE